UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
RKI CONSTRUCTION, LLC,

               Plaintiff,          **MEMORANDUM AND ORDER**
                                   14-cv-1803 (KAM)(VMS)
-against-

WDF INC.; LIBERTY MUTUAL INSURANCE
CO.; ANDRON CONSTRUCTION CORP.; and
TRAVELERS CASUALTY AND SURETY CO. OF
AMERICA,

               Defendants,

-against-

CITIZENS INSURANCE CO. OF AMERICA;
LEROY KAY; and ALICE KAY

               Additional Defendants
               on the Third-Party
               Claims.
---------------------------------------X
KIYO A. MATSUMOTO, United States District Judge:

      Plaintiff RKI Construction, LLC ("RKI") commenced this

diversity breach of contract action against WDF Inc. ("WDF"),[1]

which filed a counterclaim against RKI, a third-party breach of

contract claim against Citizens Insurance Company of America

("Citizens"), which issued a subcontractor performance bond (the

"Bond") to secure RKI's performance under a subcontract with

---

[1]    Andron Construction Corp. ("Andron") and Liberty Mutual Insurance
Company ("Liberty") were originally named as defendants in this action.  On
April 18, 2016, Andron and Liberty settled with RKI and were dismissed by
RKI, without prejudice.  (*See* ECF No. 98, Stipulation of Partial Settlement
and Partial Dismissal without Prejudice.)  Travelers Casualty and Surety
Company of America ("Travelers") is also listed as a named defendant but has
not asserted any counterclaims.

WDF, and a third-party claim against Leroy Kay and Alice Kay for fraud.[2]  (*See* ECF Nos. 32, 38, Amended Complaint ("Am. Compl.") and Answer.)

On February 25, 26, 27, and 28, March 1, and April 3, 2019, the court conducted a six-day bench trial, where it considered the parties' claims arising out of a sub-subcontract between RKI and WDF to install piping for WDF's HVAC work, for construction of a five-story elementary school in Ridgewood, Queens (the "Project").[3]  Having considered the evidence presented at trial, assessed the credibility of the witnesses, and reviewed the parties' post-trial submissions,[4] the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52 ("Rule 52").[5]

---

[2]    By Memorandum and Order issued April 3, 2017, the court: (i) denied RKI's motion for summary judgment on its claim against WDF and WDF's counterclaim, and (ii) granted Citizens' motion for summary judgment and dismissed WDF's third-party claim against Citizens. (ECF No. 113)(*RKI Construction, LLC v. WDF, Inc.*, No. 14-cv-1803 (KAM) (VMS), 2017 WL 1232441 (E.D.N.Y. Apr. 3, 2017).)

[3]    The trial addressed the parties' liability and damages.  The court reserved judgment on any issues regarding the award of fees until after its ruling on liability.  Specifically, the court held the following claims in abeyance: (i) WDF's claim for legal fees; (ii) the Kay's counterclaim for fees; (iii) RKI's fifth claim for interest based on WDF's violation of New York General Business Law § 756-a; (iv) and RKI's, Leroy Kay's and Alice Kay's claim against WDF for making a wrongful claim against the Bond. (*See* ECF Minute Entry dated Feb. 22, 2019.)

[4]    The post-trial submissions of the parties consist of the following: ECF No. 198, Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Pl. Mem."); ECF No. 200 Defendant's Proposed Findings of Fact and Conclusions of Law ("Def. Mem."); ECF No. 201, Plaintiff's Response to Defendant's Proposed Findings of Fact and Conclusions of Law ("Pl. Resp."); ECF No. 203, Defendant's Response to Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Def. Resp.").

[5]    "In an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately.  The

Based on the trial record, for the reasons set forth below, the court concludes that RKI proved its claim for breach of contract by a preponderance of the evidence, and WDF failed to prove its counterclaims for breach of contract by a preponderance of evidence and fraud by clear and convincing evidence.[6]

## PROCEDURAL HISTORY

RKI commenced this action on March 20, 2014, and filed the operative amended complaint on March 11, 2015. (*See* Am. Compl.)  WDF filed its answer to the Amended Complaint, counterclaim against RKI, and third-party claim against Citizens on March 25, 2015.  (*See* Answer.)  The court issued its summary judgment Memorandum and Order on April 3, 2017, granting summary judgment to Citizens and denying summary judgment to RKI.  (*See* ECF No. 113, Mem. and Opinion.)  In its summary judgment decision, this court left open the "triable issues of fact as to whether or not RKI performed under the contract, and whether WDF properly deemed RKI to be in default." (*Id.* at *5.)  Trial

---

findings and conclusions may . . . appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1).  Under Rule 52(a), findings of fact may be determined "based on oral or documentary evidence," and "findings of fact in a bench trial based on written submissions are accorded the same deference as factual findings that are otherwise determined." *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 135 (2d Cir. 2001) (citing Fed. R. Civ. P. 52(a)).

[6]   To establish a fact by a preponderance of evidence means "simply to prove that the fact is more likely true than not true." *United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994); *see also Velasquez v. United States Postal Serv.*, 155 F. Supp. 3d 218, 227 (E.D.N.Y. 2016).  As the finder of fact, the court is entitled to make credibility findings as to the witnesses and their testimony.  *See Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012).

began on February 25 and continued through February 28, March 1, and April 3, 2019.

## FINDINGS OF FACT

At trial, plaintiffs presented testimony from David Kay, Alice Kay, two managing members from RKI, RKI counsel Michael Zicherman, Esq., and WDF counsel Becky Tung, Esq. as witnesses. Defendants called Antonio Gentile, SCA's project officer, Robert Bailey, Andron project manager, Liam McLaughlin, WDF Senior Vice President, and John Cutrone, WDF project manager, as witnesses. The court was also provided with a Declaration of Mark Wilson, formerly employed by Andron as an operations manager on the Project, which was admitted into evidence without objection.[7] (Trial Transcript ("Tr.") 1031:7-1035:5, 1166:14-16.) Pursuant to Federal Rule of Civil Procedure 52, the court considers the evidence offered at trial and makes the following findings of fact below.

## I.   The Parties

The New York City School Construction Authority ("SCA") is "a public benefit corporation established pursuant to New York Public Authority Law §§ 1727 *et seq.*, whose primary purpose is to design, construct, and maintain educational facilities in New York City." *A.F.C. Enterprises v. New York*

---

[7]    At trial, the parties stipulated that all exhibits in the joint exhibit binders would be admitted into evidence. (Tr. 17:13-16; *see* ECF Nos. 208-210 (joint trial exhibits cited herein).)

4

*City Sch. Const. Auth.*, No. 98-cv-4534 (CPS), 1999 WL 1417210, at *1 (E.D.N.Y. June 29, 1999).

Andron is a corporation organized under the laws of New York with its principal place of business in Goldens Bridge, New York. (ECF No. 38, Answer to Amended Complaint with Counterclaims ("Answer"), ¶ 4.) Andron is a general contractor and construction manager providing services in the New York region.

WDF is a corporation organized under the laws of New York with its principal place of business in Mount Vernon, New York. (Answer ¶ 26.) WDF is in the business of providing plumbing, mechanical, and heating, ventilation, and air conditioning ("HVAC") services.

RKI is a limited liability company founded in 2008. (Tr. 9:17-23.) RKI is organized under the laws of New Jersey with its principal place of business in Colts Neck, New Jersey. (Am. Compl. ¶ 1.) Members of RKI included David Kay, Leroy Kay, and Alice Kay. (Tr. 9:24-10:5.) RKI provides services related to HVAC piping and is recognized as a Women's Business Enterprise. (*Id.* 9:1-2, 10:13-14.)

Citizens is a corporation existing under the laws of Michigan with its principal place of business in Howell, Michigan. (Answer ¶ 27.) Citizens is in the business of issuing surety bonds. (*Id.*)

## II.   The Construction Contracts and Subcontracts

In or about December 2011, Andron, as general contractor, entered into a written agreement with the SCA in connection with a project for the construction of a five-story public school, P.S. 290, located in Queens, New York (the "P.S. 290 project," the "Project," or the "school project").  (ECF No. 154, Proposed Pretrial Order, Ex. 1, Joint Stipulation of Facts ("Joint Stip."), ¶ 1.)  As the general contractor, Andron was responsible for coordinating the work of all of the contractors on the job site, which included developing the project schedule and workflow.  (Joint Stip. ¶ 1.)

In or about October 2012, WDF entered into a written subcontract with Andron to perform certain HVAC work for the school project.  (*Id*. ¶ 2.)

On or about October 22, 2012, RKI, as a sub-subcontractor, entered into a written sub-subcontract, with WDF to perform the piping portion of the HVAC work for the school project ("WDF-RKI agreement" or the "sub-subcontract").  (*Id*. ¶ 3.)  The agreed upon price and reasonable value of the work, labor, services and materials to be provided by RKI to WDF in connection with the sub-subcontract was $1,252,000.00.  (*Id*. ¶ 4.)

Pursuant to the WDF-RKI agreement, RKI retained Citizens, as surety, and entered into a subcontractor

performance bond.[8]  (ECF No. 103-1, Statement of Material Facts in Support of Motion for Summary Judgment, ¶ 6.)  RKI, Citizens, and WDF entered into the Bond on January 4, 2013. (ECF No. 101-5, Declaration of Bogda Clarke, attorney for Hannover Insurance Group, an affiliate of Citizens, in Support of Motion for Summary Judgment Ex. A, A312 Subcontractor Performance Bond.)

A. The WDF-RKI Agreement

The WDF-RKI agreement governed the sub-contractor and sub-subcontractor relationship, respectively, between WDF and RKI and provided the contractual rights and duties of each party as relevant to the P.S. 290 project.

The parties' payment obligations were described in the sub-subcontract.  Pursuant to Article 4 of the sub-subcontract, WDF was to make progress payments to RKI within five days after receiving a progress payment from Andron.  (ECF Nos. 208, 209, 210, Joint Trial Exhibits ("Joint Ex.") 3; Def. Mem. ¶ 4.)[9] Article 6 permitted WDF to withhold payments from RKI to protect itself from potential breaches of contract, so long as WDF

---

[8]      "When a surety issues a performance bond, the surety guarantees ... that the project will be completed a certain price irrespective of whether the contractor [or subcontractor] is able to complete the project." *Acranom Masonry, Inc. v. Wenger Constr. Co.*, No. 14-cv-1839 (PKC)(RML), 2019 WL 3798047, at *8 n.9 (E.D.N.Y. Aug. 13, 2019) (quoting *In re ADL Contracting Corp.*, 184 B.R. 436, 440-41 (S.D.N.Y. 1995)).

[9]      The sub-subcontract refers to WDF as the "Contractor" and RKI as "Subcontractor."

provided RKI "prior written notice" that was accepted by RKI. (Joint Ex. 3 at 6.)

The sub-subcontract also required RKI to "furnish and maintain at all times sufficient, qualified and competent forces and supervision, and adequate, conforming and usable materials, equipment, plants, tools and other necessary things, to achieve timely progress" according to the current progress schedule or any modified schedule. (Joint Ex. 3 at 7 (Article Seven).) Upon receiving a modified project schedule, RKI was obligated to perform according to the modified schedule, unless it provided written objections with 48 hours of receipt. (*Id.*) Under Article 7, WDF was permitted to "direct acceleration" of RKI's performance at the Project. (*Id.*)

The sub-subcontract further described the circumstances and remedies for any purported default or termination of the sub-subcontract. Article 26 specified several events that would constitute default by RKI, (Joint Ex. 3 at 23-25), and prescribed the following procedures for invoking default and terminating the sub-subcontract:

> [I]n every such event, if any, each of which shall constitute a default hereunder by Subcontractor [RKI], Contractor [WDF] shall . . . after *giving Subcontractor written notice of default and forty-eight (48) hours* within which to cure said default, have the right to exercise any one or more of the following remedies: . . .

8

> (iii) after giving Subcontractor *an additional*
> *forty-eight (48) hours written notice* (at any
> time following the expiration of an initial
> forty-eight (48) hours notice and curative
> period), terminate this Subcontract in whole
> or part . . . .

(*Id.* at 24 (emphasis added).)  Thus, under the terms of the sub-subcontract, WDF was required to provide two written notices of default to RKI with two separate 48 hours periods before WDF was authorized to terminate the sub-subcontract.  (*Id.*)

Article 10 of the sub-subcontract described the legally sufficient notice each party was required to provide in the event of a default.  (*Id.* at 11.)  It provides that "written notice provided for in this [sub-subcontract] shall be deemed given if delivered personally to an officer or partner or similar principal position, as the case may be, of a party or sent by certified mail, return receipt requested, in the custody of the United States Postal Service to the authorized executive or representatives of a party at its address."  (*Id.*)

In the event there was a change in the scope of work at the school construction project, Article 9 of the sub-subcontract provided that RKI would not proceed with "change order work" without a "Change Order" issued by WDF.  (*Id.* at 9-11 (Article 9).)  Further, under Article 20, RKI was not permitted to commence any work "requiring a shop drawing or

sample submission . . . until the submission has been approved by the Architect." (*Id.* at 19.)

Exhibit B to the sub-subcontract provided the scope of work for WDF and RKI. (*Id.* at 36 (Exhibit B).)  Among other things, RKI was obligated to:

> Furnish all labor, pipe, valves, fittings, materials and equipment necessary to install Piping & HVAC Equipment . . .
>
> Install all piping and equipment specialties provided by WDF, Inc. . . .
>
> Provide a two-week look-ahead listing planned areas and scope of work
>
> [C]losely follow the flow of the job according to the project schedule

(*Id.* at 36.)  Moreover, Exhibit B also provided that "WDF Inc. will incur costs of Payment & Performance Bond for RKI Construction LLC." (*Id.* at 38.)  Finally, Article 21 provided RKI the authority to control the "construction means, methods, [and] techniques" for performing its work associated with the construction project. (*Id.* at 20 (Article 21).)

## III.  The P.S. 290 Project

RKI began field work at the P.S. 290 project in February 2013. (Tr. 24:20-25:16.)  RKI was tasked with installing the "heating and cooling piping" for the HVAC system, which included supplying the "pipes itself, the hangers, [and]

the miscellaneous valves" on all five stories and the cellar at
P.S. 290.  (*Id.* 12:18, 14:3-4.)

A. The Requisition and Payment Process

The P.S. 290 project used a requisition process to pay
contractors, sub-contractors, and sub-subcontractors for work
performed.  Pursuant to the sub-subcontract, WDF was obligated
to pay RKI for services performed at the Project after it
received payment from Andron or SCA. (Joint Ex. 3 at 3-5
(Article 4).)  After RKI finished a portion of its piping work,
RKI would submit a requisition to WDF for payment for that work.
(Tr. 569:10-18.)  WDF, in turn, negotiated the line items on its
requisition request with Andron.  (*Id.*)  Andron, the general
contractor, negotiated the payment requests with SCA, the state
construction authority.  (*Id.*)  After review, SCA would pay
Andron, who in turn would pay WDF.  (*Id.*)  Once WDF received
payment from Andron, any previously requested payments became
due to RKI pursuant to sub-subcontract.  (*See* Joint Ex. 3 at 3-4
(Article 4).)  The entire requisition and payment schedule could
take several weeks to process.  (Tr. 569:10-18.)

David Kay, a member of RKI, managed the RKI field
operations, including ordering materials, tracking the schedule,
going to job sites, and preparing all RKI requisitions sent to
WDF for payment.  (*Id.* 10:22-11:15, 34:6-35:9.)  Alice Kay,
another member of RKI and Mr. Kay's wife, was responsible for

11

managing RKI's office, payroll, and accounting, which included processing RKI's requisition paperwork. (*Id.* 34:9-16, 886:13-17, 887:1-12.)  In total, RKI submitted seven requisitions to WDF for work performed at the P.S. 290 project. (Joint Stip. ¶ 34.)

B. <u>The Work Schedule and Change Orders</u>

Andron, as general contractor, scheduled the flow of work at the P.S. 290 project on whiteboards in its field site office. (Joint Stip ¶ 38.)  Andron's Whiteboard (the "Whiteboard") would describe the project schedule and list deadlines for the ongoing construction projects by various subcontracting trades. (Tr. 101:23-102:6.)  The Whiteboard was updated every two weeks by Andron and was maintained in the Andron's site office. (*Id.* 124:1-18.)  Andron's operations manager Mark Wilson managed the Whiteboard. (*Id.* 713:9-17.) The Whiteboard described the P.S. 290 workflow based on a baseline schedule and served as "a break down of certain phases" of construction work, including the "times [and] durations for certain areas, certain floors for different trades to perform their work," as determined by Mr. Wilson. (*Id.* 713:9-17, 1195:21-1196:15.)  The Whiteboard was developed from the Critical Path Method ("CPM")[10] schedule and listed specific dates

_____

[10]    "A CPM [critical path method] schedule is a standard construction device used to plan activities of a construction project in a logical, orderly sequencing manner citing durations for different activities from the

for specific work, with a review of how those dates would impact the rest of the project. (*Id.* 713:18-714:16.) As the subcontractor, WDF was responsible for communicating any revised deadlines as set forth on the Whiteboard to its sub-subcontractors. (*Id.* 734:17-735:18.)

Andron held weekly foreman's meetings and project management meetings. John Cutrone, a WDF project manager at the P.S. 290 project, would attend most meetings. Mr. Cutrone saw and was aware of the Whiteboard. (Tr. 698:19-21; 1177:4-12.) Andron's Mark Wilson wrote dates on the Whiteboard. (Tr. 1219:15-24, 1220:2-19.) RKI's foreman and David Kay would occasionally attend the weekly meetings. (Tr. 1177:16-1178:7.) Mr. Kay testified that Andron held meetings every two weeks to go over the progress of the project with the various subcontractors. (Tr. 106:22-107:5.) Mr. Kay further testified that he never received the official CPM schedule, (Tr. 101:21-102:6), and WDF agreed that the Whiteboard and not the CPM schedule guided the P.S. 290 project. (Tr. 1195:21-1196:5.) As of August 15, 2013, several months after RKI began fieldwork at the Project, a photograph of the Whiteboard, stated "Needs

---

beginning of the job to the end." *In re GII Indus., Inc.*, 464 B.R. 557, 561 n.1 (Bankr. E.D.N.Y. 2011) (internal quotation marks omitted); *see* Tr. 268:17-25 (David Kay testifying that a CPM schedule "showed exactly where the job was" in terms of project delays and anticipated deadlines).

dates," under "Hydronic Piping," the work that RKI was to perform.  (*See* ECF No. 218, RKI Trial Exhibits ("RKI Ex.") 47.)

C. Changes to the Scope of Work

Like many large-scale construction projects, the P.S. 290 project experienced several delays and design changes leading to extensions of time in finishing the Project and changes in work plans.  On April 28, 2013 the SCA issued Bulletin No. 7, making certain changes to the Project.  (ECF No. 103-3, Zicherman Decl. Ex. F, Schedule update at SCA-01456.) Bulletin No. 7 impacted the HVAC work, including RKI's piping work because it required that the pipes be rerouted.  (Tr. 191:15-192:20.)  WDF did not issue a written change order to RKI with respect to Bulletin No. 7.  (*Id.* 188:11-13.)

In October 2013, Andron submitted a request for extension of time to the SCA due to SCA's design changes and other changes to the Project.  (Joint Stip. ¶ 39.)  Andron attributed 188 days of delay to SCA's design changes and sought an extension of the completion date.  (*Id.* ¶ 40.)  On or about February 12, 2014, the SCA approved a change order in favor of Andron in the sum of $900,000.00 for acceleration costs.  (*Id.* ¶ 41.)  On or about February 13, 2014, the SCA admitted that 92 calendar days of delay were caused by the SCA and approved Andron's change order for a 61-day time extension.  (*Id.* ¶ 42.)

14

D. Delays in Payment

It is undisputed that RKI was paid in full by WDF for work performed and material delivered through May 31, 2013. (Joint Stip. ¶ 8.)  Mr. Cutrone, the WDF project manager, testified at trial that he "didn't have a problem with where [RKI was] in terms of work in place" for the period of February 2013 to May 2013.  (Tr. 1185:5-15.)

After May 31, 2013, however, RKI received delayed or insufficient payments from WDF for work performed at the P.S. 290 project.  In July and August 2013, RKI submitted several additional requisitions to WDF for work performed by RKI in June through September 2013.  (Joint Stip. ¶¶ 31-34.)  WDF did not pay RKI for work performed at the P.S. 290 project during June through August 2013.  (*Id.* ¶ 36.)  WDF received additional payments from Andron totaling $134,274.07 for work and material provided by RKI during the period ending June 30, 2013 through August 31, 2013.  (*Id.* ¶ 8.)

Both parties argue that several delays and factors contributed to WDF's decision to not pay RKI for the work performed from June to August 2013.  RKI argues that WDF breached the sub-subcontract by failing to remit payments within five days after receiving payments from Andron.  (Pl. Mem. at 26.)  WDF argues that RKI breached the sub-subcontract by falling behind the work schedule, failing to provide piping, and

failing to adequately staff the construction site pursuant to WDF's directives.  (Def. Mem. at 2.)

As set forth below, the court finds that WDF breached the terms of the sub-subcontract by failing to pay RKI for work performed at the Project from June to August 2013.  The court further finds that WDF failed to follow proper procedures for terminating the contract, as set forth in Article 26 of the sub-subcontract.  In reaching this conclusion, the court finds that the correspondence WDF sent to RKI in August and September 2013 were insufficient to serve as a Notice of Default and 48-hour period to cure under the sub-subcontract.

E. Termination of the Sub-subcontract

RKI's purported failure in performance of specific work items led WDF to terminate the sub-subcontract.  On August 28, 2013, WDF's Senior Vice President, Liam McLaughlin delivered to RKI a letter titled "48-HOUR NOTICE," (1) advising RKI and counterclaim-defendant Citizens that "WDF may declare RKI in default" and (2) requesting a meeting with Citizens and RKI "to discuss how this matter may be immediately resolved."  (Joint Stip. ¶ 5; Joint Ex. 56 (the "August 28, 2013 Letter").)  WDF identified seven work items which it required RKI to perform to various levels of completion within 48 hours: (1) the completion of cellar piping; (2) delivering piping to the first floor; (3) roughing the piping on the first floor; (4) delivering piping to

the second floor; (5) delivering piping to the third floor; (6) installing condenser curbs on the roof; and (7) providing a manpower loaded two-week schedule.  (*Id.*; Joint Ex. 56.)  WDF asserts that the August 28, 2013 Letter qualified as a 48-hour notice of default delivered to RKI.  (Def. Mem. at 27.)  For reasons further explained below, the court finds that the August 28, 2013 Letter was not a notice of default under the sub-subcontract because it did not notify RKI of a default but instead stated that WDF "may declare" a default and requested a meeting with RKI to "resolve" the matter.  (Joint Ex. 56.)

On August 29, 2013, RKI responded to WDF's August 28, 2013 letter, and asserted that WDF's letter was based on inaccurate information concerning the schedule and that RKI was providing proper manpower and set forth the status of its work in response to the seven work items previously identified. (Joint Stip. ¶ 6; Tr. 213:15-214:5.)

On September 5, 2013, WDF notified RKI by email that it had failed to comply with the directives described in the August 28, 2013 Letter.  (Joint Ex. 134.)  Between September 5 and September 13, WDF and RKI exchanged several correspondences relating to RKI's delivery of piping, the number of RKI employees staffed at the worksite, and the percentage of work completed at the project.  (*See* Joint Exs. 101, 104, 137.)

On Friday, September 13, 2013, WDF notified Citizens that it was planning to issue a notice of default to RKI on September 16, 2013 and that WDF would perform RKI's remaining work on the P.S. 290 project. (Joint Ex. 104.) On that same day, Friday, September 13, WDF's general counsel sent an email to RKI, notifying RKI that WDF "will default RKI on Monday per the performance bond terms." (Joint Ex. 105.) WDF asserts that the September 13 email constitutes a second 48-hour notice of default, notifying RKI of its breach of the sub-subcontract and state of default. (Def. Mem. ¶ 53.)

On September 16, 2013, WDF sent a letter to RKI and Citizens informing RKI that it was in default of the sub-subcontract and terminating the sub-subcontract. (Joint Stip. ¶ 7; Joint Ex. 57 (the "September 16, 2013 Letter").) In the letter, WDF claimed that RKI was in breach of the sub-subcontract after it failed to satisfactorily perform the seven activities previously identified in the August 28, 2013 Letter. (Joint Ex. 57.) At trial, WDF's general counsel, Becky Tung confirmed that no other written notice was delivered to RKI between August 28, 2013 and September 16, 2013. (Tr. 526:22-528:4.)

On September 17, 2013, RKI hand delivered to Mr. Cutrone RKI's requisition for payment No. 7 in the amount of

$299,310.84 for work performed by RKI between June and September 2013 at the P.S. 290 project. (Joint Ex. 46.; Joint Stip ¶ 34.)

On September 24, 2013, Citizens sent WDF a letter advising that Citizens was investigating WDF's demand that Citizens perform in accordance with the terms of the performance bond. (ECF No. 102-3, Tung Citizens Declaration, Ex. F, Letter from Jonathan Bondy dated September 24, 2013.)

On October 21, 2013, Citizens sent WDF a letter denying WDF's claim under the Bond based on contractor default because: (1) WDF failed to pay RKI properly under the terms of the sub-subcontract and (2) Citizens did not find RKI to be materially in breach of their obligations under the sub-subcontract agreement. (*Id*. Ex. G, letter from Jonathan Bondy dated October 21, 2013.)

## IV. RKI's Compliance with WDF's August & September 2013 Letters

Having considered the evidence presented at trial and assessed the credibility of the witnesses, the court finds that RKI either satisfied, or was not required under the sub-subcontract to comply with the seven work items identified in WDF's August 28 and September 16, 2013 Letters.[11]

---

[11] To the extent that any of the following Findings of Fact may be deemed Conclusions of Law, or vice versa, they shall also be considered as both findings and conclusions. *See Miller v. Fenton*, 474 U.S. 104, 113-14, (1985) (noting the occasional difficulty of differentiating findings of fact from conclusions of law); *see also Int'l Union of Painters and Allied Trades,*

As a preliminary matter, the court respectfully rejects WDF's assertions in its proposed findings of fact that attempt to expand the court's review of the relevant factual issues. (*See* Def. Mem. at 1-2 (referring generally to RKI's performance in June and August 2013).)  At trial, the court specifically asked WDF's counsel whether the bases for WDF's termination of the sub-subcontract was limited to the seven activities identified in WDF's August 28, 2013 and September 16, 2013 Letters. (*See* Tr. 1237-38.)  In response, WDF's counsel represented that WDF's termination of the sub-subcontract was "limited" to those letters and RKI's performance in "September, not in July and August." (*Id.* 1237:23-1238:1.)  WDF's counsel further advised the court that he had given the issue "a lot of thought" and concluded that the sub-subcontract termination was "based on the [seven] items" in the August 28, 2013 and September 16, 2013 Letters. (*Id.* 1209:20-23.)  When the court invited WDF counsel to clarify his representations and advised him that he was "binding" his "client to the reasons set forth in the termination letter," WDF's counsel conceded that WDF "binded themselves."[12]  (*Id.* 1239:19-21.)  Given these clear and

---

*AFL-CIO v. Local 8A-28A*, No. 09-CV-4358 (RRM)(RLM), 2010 WL 3780366, at *1 n.1 (E.D.N.Y. Sept. 21, 2010).

[12]    The court concludes that WDF's counsel's repeated representations at trial limiting the reasons for termination to the August 28 and September 16, 2013 Letters constitute judicial admissions binding on WDF.  The Second Circuit has explained that "[j]udicial admissions are not evidence at all.  Rather, they are formal concessions in the pleadings in the case or

unequivocal statements and admissions by WDF's counsel at trial, the court limits its findings of fact relating to RKI's performance under the sub-subcontract (and subsequently its purported breach) to the seven activities identified in WDF's August 28, 2013 and September 16, 2013 Letters.

Based on the foregoing, RKI's performance in June through August 2013 is immaterial to the breach of the sub-subcontract claim because WDF clearly and unambiguously represented that the sub-subcontract was terminated for the seven alleged deficiencies in performance identified in WDF's August 28 and September 16, 2013 Letters to RKI.  (Joint Exs. 56-57.)  After reviewing the evidence submitted at trial and weighing the credibility of the witnesses, the court concludes that RKI either satisfied the conditions outlined in the August 28 and September 16, 2013 Letters or was not required to satisfy those activities under the sub-subcontract.  As a result, the court concludes that RKI was not in default of the sub-subcontract for the reasons stated in WDF's August 28 and September 16, 2013 Letters.

---

stipulations by a party or counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) (quoting 2 McCormick on Evid. § 254 (6th ed. 2006)).  To be considered a judicial admission, a statement must be a "clear and unambiguous admission of fact." *United States v. McKeon*, 738 F.2d 26, 30 (2d Cir. 1984).  Here, as noted above, WDF's counsel made a "clear and unambiguous admission" as to the limited reasons for WDF's termination of the sub-subcontract. *Id.*

A. WDF's August 28 and September 16, 2013 Letters

In its August 28, 2013 Letter, which WDF's General Counsel, Becky Tung, reviewed before it was sent by WDF Senior Vice President Liam McLaughlin, WDF identified seven activities that RKI was allegedly underperforming which led to RKI's purported breach of asserted default under, the sub-subcontract:[13]

1.   "Cellar piping to be 100% rough"

WDF demanded that RKI complete the "Cellar piping to be 100% rough." (Joint Ex. 56.)  Several weeks later, in the September 16, 2013 Letter, WDF changed its demand to "Cellar piping to be 100% complete." (Joint Ex. 57.)  Although the practical significance of WDF's shifting demand from "100% rough" to "100% complete" is unclear from the evidence, WDF admitted at trial that RKI had performed as much work as possible in the cellar by September 10, 2013 -- six days before WDF delivered its notice of default.  (See Tr. 1347:25-1348:9 (Cutrone stating that RKI "roughed as far as they can go down there [the cellar] at this time.  They have a little bit more work down here, but we will wait until the brickeys [bricklayers] get out of here.").)  WDF represented that the

---

[13]    The court notes that Mr. McLaughlin admitted at trial that he never reviewed a CPM schedule for P.S. 290 (Tr. 1005:12-17) and that the percentages for the work activities in the August 28, 2013 Letter were "an arbitrary determination by John [Cutrone] and I."  (Tr. 1069:20-1070:3.)

only work remaining at the cellar level had to await the
bricklayers completing work and leaving the area.  (*See* Tr.
1348:11-17.)  Accordingly, RKI's piping activity in the cellar,
measured under either the "rough" or "complete" standard, was
satisfied by RKI as of September 10, 2013 because RKI could not
proceed with any work in the cellar.

      2.   <u>"1st floor piping material to be 50% on site"</u>

    WDF also demanded that RKI deliver 50% of piping
material to the first floor at P.S. 290.  In the August 28, 2013
Letter, WDF confirmed that this activity had been completed.
(Joint Ex. 57 ("1st floor piping material to be 50% on site-
Complete").)

      3.   <u>"1st floor piping installed to be 35% rough"</u>

    The August 28, 2013 Letter demanded that 1st floor
piping was to be "35% rough."  (Joint Ex. 56.)  The September
16, 2013 Letter increased the percentage of work to "45% rough."
(*See* Joint Exs. 56-57.)  Thus, like the demand for cellar
piping, WDF's demand for 1st floor piping similarly expanded in
scope between August 28 and September 16, 2013.  In the
September 16, 2013 Letter, WDF claimed that the 1st floor piping
was "not done" and was only "20% complete."  (Joint Ex. 57.)

    Notwithstanding the ten percent increase in WDF's
demand for "rough" piping work, RKI submitted credible evidence
and testimony showing that it satisfied the "roughing"

percentages for the 1st floor piping in excess of the 45%
benchmark set by WDF.  For example, Mr. Cutrone, WDF's project
manager, explained at trial what activities qualified as
"roughing" for purposes of the August 28 and September 16, 2013
Letters.[14]  (*See* Tr. 1293-94.)  Relying on Mr. Cutrone's metrics
for "roughing," RKI credibly demonstrated that it exceeded the
higher 45% benchmark set in the September 16, 2013 Letter.
Indeed, RKI credibly explained that based on Mr. Cutrone's
metrics, RKI completed approximately 60% of roughing on the
first floor according to the RKI's August 2013 requisition for
payment, (*see* Joint Ex. 43 (line items 91 through 97; comparing
"Total Completed and Stored to Date" work with "Contract
Value")), and approximately 56% of roughing according to WDF's
approved August 2013 requisition for payment.  (*See* Joint Ex. 45
(same).)  Hence, RKI presented credible documentary evidence
showing that it satisfied the 45% "roughing" threshold set by
WDF in the September 16, 2013 Letter.[15]

---

[14]    Mr. Cutrone identified the following work items as included in
"roughing" work: (i) delivery of pipe, (ii) delivery of valves and pipe
specialties, (iii) installation of hot water system mains, (iv) installation
of hot water system branches, (v) installation of secondary system mains,
(vi) installation of secondary system branches, (vii) installation of
condensate drainage piping, (viii) installation of secondary system risers,
(ix) and installation of hot water system risers. (*See* Tr. 1293-94
(referring to line items 43, 44, 45, 46, 47, 48, 49, 57 and 58 of the August
2013 requisition approved by WDF).)

[15]    Moreover, the court also finds that Mr. Cutrone provided inconsistent
testimony with respect to the 1st floor completion percentages.  Although the
September 16, 2013 Letter concluded that RKI only completed 20% of the 1st
floor piping, Mr. Cutrone, in an email submitted into evidence, represented
that RKI completed 30% of the rough in work as of September 5, 2013.  Thus,

4.  2nd & 3rd floor "piping material to be 50% on
    site"

Another issue identified by WDF in its August 28 and
September 16 Letters was RKI's alleged delay in delivering
piping material to the construction site.  Although RKI had a
contractual obligation to provide piping materials under the
sub-subcontract, (*see* Joint Ex. 3 at 36 (Exhibit B)), RKI also
retained the contractual right and responsibility to control the
means and methods for performing work at the P.S. 290 project
consistent with the current project schedule.  (*See id.* at 20
(Article 21).)  Here, it is undisputed that Andron scheduled the
flow of work through the Whiteboard in Andron's site office, and
that under the sub-subcontract, RKI "shall be bound by the
interpretations and decisions of Architect, GC [Andron], and
Owner to the same extent as" WDF.  (*Id.;* Joint Stip. ¶ 38.)  At
trial, RKI presented credible evidence showing that that the
Whiteboard displayed no deadlines for second and third floor
piping work until September 6, 2013.  (*See* RKI Ex. 46 at RKI 203
(Revised Whiteboard reflecting September 30 deadline set for
second floor; October 14 deadline set for third floor); *see also*
Tr. 165, 322:8-324:5)  Consistent with RKI's contractual right
to control the means and methods of its performance, Mr. Kay

---

WDF's 30% completion rate is inconsistent with the 20% completion rate as
noted in WDF's September 16, 2013 Letter.  The Court accords no weight or
credibility to WDF's shifting statements and instead credits RKI's evidence,
including, but not limited to, Joint Exs. 43 and 45.

testified that RKI's practice in 2013 was to deliver the piping materials two days before the work was to be performed by RKI to avoid theft of materials from the work site.  (Tr. 112:17-113:1, 219:3-220:15.)  The court finds that RKI's practice of delivering piping two days before the works was to be performed was reasonable in light of RKI's right to control the means and methods of its performance and that under the revised Whiteboard deadline, Andron, the general contractor, had not required dates for RKI's work, and RKI was not required under the sub-subcontract to deliver 50% of the piping material by September 16, 2013.  Accordingly, WDF's assertion that RKI failed to deliver the piping according to its September 16, 2013 Letter is immaterial to RKI's performance of the sub-subcontract.

### 5.   "Condenser curbs installed on roof"

WDF's August 28, 2013 Letter also demanded RKI to install condenser curbs on the roof of P.S. 290.  (Joint Ex. 57.)  A curb is an object that holds equipment such as a condenser or fan, and was to be installed on top of the P.S. 290 roof.  (Tr. 1331:13-15, 1335:9-25.)  Due to the size of the condenser curbs, Mr. Kay determined that a crane was needed to hoist the curbs to the roof.  When WDF's truck had arrived at the Project with the condenser curbs, however, WDF's crane was no longer at the site.  (Tr. 183:4-186:21, 199:4-200:3, 259:25-261:11, 1371:15-1373:11, 1376:1-1377:15; RKI's Exs. 73, 74.)

Though Mr. Cutrone testified that RKI could have physically carried or used some unspecified "rigging mechanism" to bring the condenser curbs to the roof, (Tr. 1331:10-1338:23), WDF failed to show that RKI could carry the curbs to the P.S. 290 roof because the size and weight of the condenser curbs are not revealed in the trial evidence.  Further, there is no evidence that WDF coordinated delivery of the condenser curbs with RKI as required under the sub-subcontract.  (*See* Joint Ex. 3 at 36 (Exhibit B); Tr. 183:22-185:22.)

In any event, even if RKI could conceivably have carried the curbs to the P.S. 290 roof, Andron's roofing subcontractor's delay in construction prevented RKI from installing the condenser curbs on the roof.  Based on the relevant testimony and evidence, the court credits RKI's explanation that the condenser curbs could not have been installed in September 2013 because the roofing subcontractor had not completed installing the roof's first layer of roofing material.  (*See* Pl. Mem. ¶ 23; Tr. 790:4-15; RKI's Ex. 21 at SCA 1455.)  Mr. Kay from RKI testified that the roof was not ready for installation of the curbs because the roofer first wanted to install a layer on the roof.  (Tr. 185:10-186:21.)  Consistent with Mr. Kay's recollection of delays by the roofer, Mr. Cutrone from WDF confirmed that as of September 5, 2013, the roofer was at least one week behind schedule and did not want installation

of curbs before he was finished.  (Tr. 1339-40). Contemporaneous
documentary evidence circulated by Mr. Cutrone also confirms the
installation delay of the roofing material by the roofer.  (*See*
Joint Ex. 134 ("Per today's Andron meeting, the roofer is 1 week
behind schedule.").)  Consequently, RKI presented consistent and
credible evidence that RKI had to wait to install the condenser
curbs on the roof until the roof was finished and further
confirmed through documentary evidence that the roof
construction did not commence until October 1, 2013.  (*See* RKI
Ex. 21 at SCA 1455 (roofing started on October 1, 2013); Tr.
790:4-15 (testimony from Andron's project manager agreeing that
the roof was not installed until October 1, 2013).)  Thus, the
court finds that RKI presented credible evidence that it was
unable to install the condenser curbs as of September 16, 2013
due to the delay in the roof construction, and concludes that
RKI did not fail to perform installation of condenser curbs on
the roof.

> 6.  Delivery of a "Manpower loaded 2 week schedule"

In the August 28, 2013 Letter, WDF demanded that RKI
provide a "Man-loaded Two (2) Week Look-Head Schedule." (Joint
Ex. 56.)  In the September 16, 2013 Letter, WDF demanded that
RKI provide a "Manpower loaded 2 week schedule." (Joint Ex.
57.)  The September 16, 2013 Letter noted that RKI failed to
comply with WDF's August 28, 2013 demand because "no manpower

[was] provided in [the] schedule." (*Id.*) A "man loaded schedule" was described at trial as a type of schedule providing "how many men are going to do each activity" at the construction site. (Tr. 221:13-15.)

Under the terms of the sub-subcontract, RKI was obligated to "[p]rovide a two-week look-ahead listing planned areas and scope of work." (Joint Ex. 3 at 36.) Thus, the sub-subcontract, unlike WDF's Letters, did not require "Manpower" or "Man-loaded" to be provided in RKI's two-week look ahead schedule. Accordingly, RKI's purported failure to provide "manpower" in the schedule is immaterial as RKI was not required to do so under the sub-subcontract.

To be sure, RKI presented evidence showing that it complied with its contractual obligation to provide WDF a two-week look ahead schedule when requested on September 16, 2013. Specifically, WDF's September 16, 2013 letter confirms that WDF received a schedule from RKI and only objected to the lack of "manpower provided in the schedule." (Joint Ex. 57.) Furthermore, Mr. Kay testified that he provided WDF "a schedule that showed dates and activities and durations" as required under the sub-subcontract. (Tr. 440:3-6.)

In sum, for the reasons stated above, the court finds that RKI presented credible evidence establishing that it either satisfied the conditions outlined in the August 28 and September

29

16, 2013 Letters or was not required to satisfy those activities under the terms of the sub-subcontract.[16]  Accordingly, based on WDF's confirmation of the seven work activities as the grounds for WDF's termination of the sub-subcontract, identified in the August 28 and September 16, 2013 Letters, the court concludes that RKI has proven by a preponderance of the evidence that WDF's termination of the sub-subcontract was without a factual basis and, in any event, in breach of the sub-subcontract as described below in the conclusions of law.

## V.   RKI's Performance of the Sub-subcontract

In the alternative, even if the court ignored WDF's counsel's representation regarding WDF's bases for terminating the sub-subcontract, and considered issues beyond the scope of the August 28, 2013 and September 16, 2013 letters, *i.e.*, RKI's performance between June and August 2013, the court finds that RKI presented a preponderance of credible evidence describing several factors that prevented RKI from completing the HVAC piping work at the P.S. 290 project.  Specifically, the court finds that RKI's credible evidence established that: (1) RKI was

---

[16]    The court also notes that WDF's Senior Vice President Liam McLaughlin testified that the percentages assigned to each activity identified in WDF's September 16, 2013 and August 28, 2013 Letters were "arbitrary determination[s]" based on "current activities" at the worksite.  (Tr. 1070:1-6.)  Although the court does not place dispositive weight on this admission, it reinforces the court's conclusion that the credible evidence RKI presented at trial, viewed in the totality of the circumstances, is consistent with RKI's position that WDF wrongfully terminated the sub-subcontract.

not behind its project schedule as determined by the Whiteboard,
(2) delays in work were substantially caused by factors outside
of RKI's control, such as delays in receiving design drawings
from SCA's architect, SCA's change orders, and work site
problems not of RKI's making, and (3) WDF contributed to any
potential breach of contract by delaying requisition payments to
RKI without justification and in contravention of the sub-
subcontract.

A. Andron's Whiteboard Schedule

As admitted by both parties, the court finds that
Andron's Whiteboard schedule was the relevant schedule for RKI's
timeline of work and that the February 20, 2013 baseline
schedule was not the basis for evaluating the timeliness of
RKI's performance in August 2013.[17] Robert Bailey, Andron's
project manager for the P.S. 290 project, explained that a
baseline (or CPM) schedule was created at the beginning of the
project to establish the timeline for the project. (Tr. 712:5-
11; 743:11-22.) During the course of a project, if delays or
other events occurred impacting the baseline dates, the

_____

[17] The court finds that the handwriting on the Whiteboard describing RKI's
project deadlines belongs to Andron's operation manager Mark Wilson and was
written on behalf of Andron. In his declaration, which was admitted into
evidence without objection by either party, Mr. Wilson stated that the
handwriting on the Whiteboard was his and that dates referring to each
project at the P.S. 290 project were updated every Tuesday. (ECF No. 194,
Decl. of Mark Wilson, at 2.) As operations manager for Andron, Mr. Wilson
ran weekly schedule meetings with trade subcontractors using the Whiteboard
for the P.S. 290 project. (*Id.*)

Whiteboard would be updated to reflect an updated schedule.
(*Id.* 726:5-12.)  It was WDF's responsibility as a subcontractor
to convey the changing deadlines on the Whiteboard to its
respective sub-subcontractors, including RKI.  (*Id.* 735:1-18.)

Mr. Kay from RKI testified that on August 15, 2013,
WDF provided him two sets of Whiteboard schedules.  (*Id.* 159-
60.)  In the morning of August 15, 2013, Mr. Kay received a
Whiteboard schedule dated August 15, 2013, containing no
deadlines for RKI's hydronic piping work and instead, including
a note: "Needs dates."  (RKI Ex. 47; Tr. 156-57.)  Later in the
afternoon of the same day, WDF sent Mr. Kay another Whiteboard
schedule.  (Tr. 159-60.)  The schedule sent in the afternoon of
August 15, 2013, however, depicted a Whiteboard with deadlines
originating from the February 20, 2013 CPM schedule.  (*See* RKI
Ex. 48 ("From Project CPM 2/20/13"); Tr. 160:18-161:23.)

On September 6, 2013, Mr. Kay took photos of another
revised Whiteboard schedule submitted into evidence setting
deadlines for RKI's piping work at the P.S. 290 project.  (*See*
RKI Ex. 46 at RKI 203 (Revised Whiteboard reflecting September
30 deadline set for second floor; October 14 deadline set for
third floor); *see also* Tr. 165, 322:8-323:14).  Based on Mr.
Kay's credible testimony and the corroborating documentary
evidence, the court concludes that RKI's deadlines were guided
by the revised Whiteboard and not the February 20, 2013 CPM

schedule.  After reviewing the revised Whiteboard schedules, the
court finds that RKI's progress as of June through August 2013
was within the expected timeframe.[18]  Accordingly,
notwithstanding the evidence showing WDF's disagreement with
RKI's progress at the P.S. 290 project,[19] the court credits RKI's
reasonable position that based on the revised Whiteboard
schedules, RKI's performance was not behind.

B. Delays in Architect Drawings, Change Orders, and
Worksite Issues

In addition, RKI presented credible evidence showing
that delays in work were substantially caused by factors outside
of RKI's control, such as delays in receiving approved design

---

[18]    Although defendants note that Mr. Kay's testimony that he had met with
Mr. Bailey to draft the Whiteboard timeline was contradicted at trial,
defendants do not dispute that the writing on the Whiteboard belonged to Mr.
Wilson, an Andron representative.  Therefore, with respect to the controlling
schedule guiding RKI's performance, it is of no moment whether Mr. Kay met
with Mr. Bailey or another individual because the documentary evidence shows
what deadlines were binding under the revised Whiteboards.

[19]    The court notes that it affords little weight to WDF's documentary
evidence describing its disagreement with RKI's progress and staffing at the
P.S. 290 project in June through August 2013.  (See Joint Exs. 102, 107, 108;
Def. Mem. ¶¶ 16, 25-27.)  Although the joint exhibits containing emails from
Mr. Cutrone and others were submitted into evidence by the parties'
stipulation at trial, the court highlighted hearsay issues apparent in each
exhibit.  (See Tr. 1223:14-1224:13 (striking portion of testimony concerning
Joint Exhibit 102); Tr. 1254:11-1255:17 (discussing double hearsay issue with
Joint Exhibit 108 and reserving decision as to how much weight to afford the
emails); Tr. 1256:13-1257:13 (striking out-of-court statements from declarant
as hearsay in Joint Exhibit 107).)  Thus, even though WDF's documentary
evidence was admitted into evidence through the parties' stipulation, this
court is obligated to consider evidence pursuant to the Federal Rules of
Evidence, and also retains discretion as the trier of fact to determine the
weight to be given to the evidence. See Krist, 688 F.3d at 95 ("[A]s trier
of fact, the judge is entitled, just as a jury would be to believe some parts
and disbelieve other parts of the testimony of any given witness." (internal
citations and quotation marks omitted)).

drawings from SCA's architect, SCA's change orders, and other work site issues.

First, there was substantial evidence presented at trial showing significant delays in the time it took for RKI to receive approvals on project drawings from the SCA architect. (*See* Tr. 102:16-104:1.)  Indeed, WDF admitted that RKI waited nearly three months, from April 29 to July 19, 2013, to receive approval from SCA on a particular drawing necessary to begin work on the first floor HVAC piping.  (*Id.* 1206-07, 1212:19-22.) Under the sub-subcontract, RKI was prohibited from beginning construction work without an approved drawing from the SCA architect.  (*See* Joint Ex. 3 (Article 20).)  RKI was aware that it was not permitted to begin work without an approved drawing and WDF admitted at trial that if RKI began construction without approval, RKI would "technically" be in violation of the sub-subcontract.[20]  (*See* Tr. 1235:8-16.)  Accordingly, RKI plausibly proved that WDF's request for additional manpower was unreasonable given the lack of work available due to the outstanding project drawings awaiting Architect approval.  (Tr. 101:1-20.)

---

[20]   WDF's contention that RKI performed some work at P.S. 290 without approved drawings is irrelevant to WDF's improper termination of the sub-subcontract.  Accordingly, even if RKI could and did begin some work without SCA's approved drawings, that would not invalidate RKI's reasonable explanation for its delays and its staffing decisions at the P.S. 290 project site or provide a justification for WDF to terminate the sub-subcontract.

Second, SCA issued Bulletin 7 in April 2013, which required a number of changes to the P.S. 290 project. Mr. Kay testified that Bulletin 7 significantly impacted RKI's piping work because it required that the pipes be rerouted. (Tr. 191:15-192:20.) Under the sub-subcontract, any change order in the construction plan was required to be in writing and delivered to RKI. (*See* Joint Ex. 3 (Article 9); *see also* Tr. 534:16-20 (WDF's general counsel describing what a change order is).) Mr. Kay testified that RKI never received a written change order from WDF incorporating Bulletin 7. (Tr. 187:7-13, 188:11-13.) WDF offered no contrary evidence. Despite not issuing a proper change notice, Mr. Cutrone from WDF directed RKI to incorporate all changes from Bulletin 7. (*See* Joint Ex. 78 at WDF 2183.) For these reasons noted above, however, RKI could not move forward without a proper written change order from WDF, thereby leading to additional delays at the construction site.

Finally, many of WDF's demands and disagreements with RKI's performance and supply of manpower were explained by numerous problems at the P.S. 290 worksite. For instance, the court credits RKI's testimony and documentary evidence showing that rain and water pooling on certain floors in P.S. 290 prevented RKI from safely using electrical tools for certain

periods.[21]  (*See* Tr. 309-310; RKI Ex. 46 at RKI 212, 213, 219
(photos taken September 6, 2013 showing water pooling on floors
at P.S. 290).)  Moreover, the court also credits RKI's position
that there was insufficient space and work for both RKI
employees and the additional trades to work in the same areas on
site.  (Tr. 259:9-15, 291:3-12.)  Although WDF asserts that RKI
failed to staff the P.S. 290 worksite with sufficient employees,
for the reasons stated above, the court concludes that RKI
presented credible evidence establishing that RKI was not behind
schedule, there was insufficient work or space for the number of
employees WDF demanded, delayed approval of project drawings
delayed RKI from starting work, unsafe water conditions existed,
other trades were working in the same areas in which RKI needed
to perform work, and WDF failed to provide written change
orders.

C. <u>WDF's Delay in Processing RKI's Requisitions</u>

Finally, and perhaps most importantly, RKI's
performance at the P.S. 290 project was hindered by WDF's

---

[21]     At trial, Robert Bailey from Andron noted that the risk of electrical
shock was eliminated through the use of "Ground Fault Interrupted Circuits"
that cut electricity automatically if voltage runs into the ground.  (Tr.
823:15-824:6.)  On the other hand, Antonio Gentile, a project officer for
SCA, recalled at trial that "water was an issue" at P.S. 290 and that the
Ground Fault Interrupted Circuits could sometimes be faulty or broken,
resulting in potential electrical shock dangers.  (Tr. 867:7-868:10.)  In
light of this conflicting testimony, the court credits RKI's position that
the presence of water at P.S. 290 was an outside factor impacting RKI's
ability to safely perform piping work.

failure to promptly process requisition payments to RKI as
required by the sub-subcontract.  RKI presented credible
testimony and evidence showing multiple delays in receiving
payment from WDF after RKI submitted its requisitions and WDF
received payment from Andron for RKI's work.  (*See* Tr. 51:8-19,
52:21-53:12, 55:11-57:23; *see also* Joint Exs. 12, 24, 26, 28.)
For example, RKI submitted its second requisition to WDF on
February 28, 2013 for work performed in the amount of
$53,273.68.  (Joint Ex. 12; Tr. 41:23-42:10.)  Three months
later, at the end of May 2013, RKI was informed that WDF would
only pay $5,000 of the requested $53,273.68 to RKI for the HVAC
piping inserts and sleeves installed by RKI.[22]  (Tr. 42:17-43:22;
*see also* Joint Ex. 82 (email from RKI to WDF dated June 13, 2013
discussing payments for sleeves and inserts).)  WDF asserted
that the piping inserts and sleeves were not paid because they
were not listed as line items on the requisitions.  (Tr.
1319:23-1320:2.)  Nonetheless, WDF also admitted that SCA would
"generally approve[]" payment for sleeves, despite WDF's
position that these requests were not appropriate.  (Tr.
1320:24-1321:20.)  Thus, the court accords little weight to

---

[22]    In fact, during the three months that WDF was in possession of RKI's
February requisition, WDF did not forward RKI's requisition to Andron for
payment until the end of May 2013.  (Tr. 1315:20-1316:14.)  WDF's
representative admitted that this three-month delay was not "timely"
processing of RKI's requisition.  (*Id.*)

WDF's inconsistent testimony and shifting explanations for its delays in processing RKI's requisitions.

As late as August 27, 2013, WDF still refused to approve payments for the sleeves and inserts installed by RKI. (Joint Ex. 138 at 409-412.)  Indeed, WDF's widespread delays persisted throughout the P.S. 290 project, with WDF confirming that payment to RKI was forthcoming even as late as September 5, 2013, when Mr. Cutrone told Mr. Kay that the "check [was] being processed." (Tr. 528:15-530:6; *see* Joint Ex. 95.)  At trial, WDF acknowledged that it was important for RKI to receive payment, (Tr. 1311:1-10), and further acknowledged that it would be impossible for RKI to continue its work without payment. (Tr. 1311:14-24.)  Accordingly, given RKI's credible testimony and contemporaneous documentary evidence, the court credits RKI's assertion that delays in requisition payments during the Project hindered RKI's ability to complete its piping work.

## VI.   RKI's Payment of Union Fringe Benefits

RKI's employees at the P.S. 290 project were steamfitters and union members from Local 638 of the Enterprise Association of Steamfitters ("Local 638"). (Tr. 1326-27.) Pursuant to a collective bargaining agreement with Local 368, RKI was obligated to pay certain fringe benefits to the union for steamfitters employed at the P.S. 290 project. (*See* RKI Ex. 54; Tr. 347:19-348:3.)  RKI would deliver a release form to WDF

indicating that RKI had paid the union fringe benefits and seeking payments from WDF.  (Joint Ex. 77 at WDF 335.)

Three releases signed by RKI formed the basis of WDF's fraud counterclaims.  Alice Kay signed a release for the payment to RKI for $5,156.95 for work performed by RKI through February 28, 2013.  (Joint Ex. 77 at WDF 324; Tr. 899:21-900:17.)  Ms. Kay signed a second release for a payment from WDF for $9,448.46 for work performed through April 30, 2013. (Joint Ex. 77 at WDF 331; Tr. 902:4-10.)  Leroy Kay -- another member of RKI and Ms. Kay's father-in law and David Kay's father -- also signed a release for payment from WDF for $26,531.35 for work performed through February 28, 2013.  (Joint Ex. 77 at WDF 336; Tr. 901:4-22.)

At trial, WDF's general counsel explained that it was important for WDF to receive release papers from RKI confirming that RKI paid union benefits to prevent creditors from later seeking contribution from WDF under New York state laws.  (Tr. 566:18-567:14.)  During the duration of the P.S. 290 project, WDF was notified that RKI owed money in union benefits to Local 368.  (Tr. 566:15-568:6.)  WDF also represented that it regularly checked with Local 638's union representative "to ensure that contractors were up-to-date in their benefit fund payments."  (ECF No. 164, WDF Mem. of Law in Opposition to RKI's Mot. in Limine at 15; Tr. 917-18.)  WDF was thus aware that

Local 638 had claimed that RKI had not paid union benefits, and was aware that WDF delayed paying RKI.

## VII.   RKI's Damages under the Sub-subcontract

The parties stipulated to the project payment process and the sums paid and unpaid.  It is undisputed that RKI was paid in full by WDF for all work and material through the period ending in May 31, 2013.  (Joint Stip. ¶ 8.)  Further, WDF received additional payments from Andron in the total sum of $134,274.07 for work and material provided by RKI for the period between June 30, 2013 through August 31, 2013.  (Joint Stip. ¶ 8.)  On or about, September 17, 2018, Alice Kay personally delivered RKI's final requisition for the sum of $299,310.84 for work performed by RKI from June through September 2013 at the P.S. 290 project.  (Joint Stip. ¶ 34.)  WDF paid RKI a sum of $5,156.95 on June 15, 2013; a sum of $9,448.46 on July 3, 2013; and a sum of $26,531.30 on July 26, 2013.  (Joint Stip. ¶ 35.)

Furthermore, both parties stipulated before trial that the damages amount claimed by RKI for its work is "$286,790.84 plus interest which is the difference between the amount due for work RKI claims to have performed ($371,747.60) and WDF's payments ($85,956.76)."  (ECF No. 190, Supplemental Stipulation of Facts and Law for Amended Joint Pretrial Order, ¶ 1.) Included in the $371,747.60 amount is the bond premium of

$31,300 related to the performance bond provided by Citizens on RKI's behalf and the bond monitoring cost of $12,520. (*Id.*)

## CONCLUSIONS OF LAW

Having reached the above factual findings based on a preponderance of the credible evidence, the court will now consider whether these facts establish liability for the parties as a matter of law.

### I. Jurisdiction and Venue

This court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the parties are of diverse citizenship and the amount in controversy exceeds $75,000. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to this action occurred in the Eastern District of New York.

### II. Applicable Law

Article 27 of the sub-subcontract provides that the sub-subcontract shall be governed and construed under the laws of the State of New York. (Joint Ex. 3 at 26 (Article 27).)

#### A. Breach of Contract under New York Law

Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages. *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) (collecting cases).

Under New York law, a party is relieved of the duty to perform under a contract only when the other party has committed a material breach. *In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997). For a breach to be considered material, "it must go to the root of the agreement between the parties." *Frank Felix Assocs. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (citations and internal quotations omitted). Failure to tender payment pursuant to the terms of a contract is generally considered a material breach. *See ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643, 649 (2d Cir. 1991).

A party injured by a breach of contract is entitled to recover damages that are the "natural and probable consequence of the breach." *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 130 (N.Y. 2008) (internal citation omitted). "The injured party, however, bears an obligation to make reasonable efforts to mitigate its damages and failure to do so may cause a court to lessen the recovery." *APL Co. PTE Ltd. v. Blue Water Shipping U.S. Inc.*, 592 F.3d 108, 111 (2d Cir. 2010) (citing *Losei Realty Corp. v. City of N.Y.*, 171 N.E. 899, 902 (N.Y. 1930)).

B. Notice of Default and Cure Provisions

Requirements for written notice informing the parties that they are in breach and providing an opportunity to cure the breach are "fully enforceable" contract terms. *Art of War Music*

42

*Pub., Inc. v. Mark Andrews*, No. 98-cv-6034 (JSR), 2000 WL
245908, at *2 (S.D.N.Y. Mar. 3, 2000).  "[W]ritten notice
provisions serve the valuable function of allowing the
purportedly breaching party to distinguish between minor
complaints or posturing by its contractual partner and an actual
threat of termination."  *Id.*  If a defendant has failed to
comply properly with the written notice requirement as
stipulated in the contract, its counterclaims for breach of
contract must be dismissed under New York law.  *See Env't Safety
& Control Cop. V. Bd. of Educ. Of Camden Cent. Sch. Dist.*, 179
A.D.2d 1012, 1013 (4th Dep't 1992) ("Defendant's remaining
counterclaims based upon alleged breach of contract should also
have been dismissed based upon defendant's failure to comply
with the condition precedent of written notice as required by
[the contract].").

        The Second Circuit has explained, however, that "New
York common law will not require strict compliance with a
contractual notice-and-cure provision if providing an
opportunity to cure would be useless, or if the breach
undermines the entire contractual relationship such that it
cannot be cured."  *Giuffre Hyundai, Ltd. v. Hyundai Motor
America*, 756 F.3d 204, 209-10 (2d Cir. 2014) (collecting cases);
*see also Sea Tow Servs. Intern., Inc. v. Pontin*, 607 F. Supp. 2d
378, 389 (E.D.N.Y. 2009) ("[A]dherence to the cure provision of

a contract is not required where it would be a futile act.").
WDF is not excused from complying with the notice and cure
provisions of the sub-subcontract based on the foregoing *Giuffre
Hyundai* factors.

C. WDF's Counterclaim for Fraud under New York Law

For a party to prevail on a claim of fraud under New
York law, "the five elements of a fraud claim must be shown by
clear and convincing evidence: (1) a material misrepresentation
or omission of fact (2) made by defendant with knowledge of its
falsity, (3) and intent to defraud;(4) reasonable reliance on
the part of the plaintiff; and (5) resulting damage to the
plaintiff." *Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230,
234 (2d Cir. 2006) (citing *Schlaifer Nance & Co. v. Estate of
Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)).

With respect to the fourth element of reasonable
reliance, if the plaintiff "has the means available to it of
knowing, by the exercise of ordinary intelligence, the truth, or
the real quality of the subject of the representation, the
plaintiff must make use of those means, or it will not be heard
to complain that it was induced to enter into the transaction by
misrepresentations." *ACA Fin. Guar. Corp. v. Goldman, Sachs &
Co.*, 32 N.E.3d 921, 922 (N.Y. 2015) (citations, brackets, and
internal quotation marks omitted).

## III.   Application of Law

Having conducted a six-day bench trial, considered the evidence presented at trial, assessed the credibility of the witnesses, and reviewed the parties' post-trial submissions, the court concludes that RKI proved its claim for breach of contract by a preponderance of the evidence, and that WDF failed to prove its counterclaims for breach of contract by a preponderance of the evidence and fraud by clear and convincing evidence. Specifically, RKI proved its breach of contract claim because WDF breached the sub-subcontract by: (1) failing to pay RKI for work performed, and (2) failing to comply with the notice and cure provision.

### A. Breach of Contract - WDF's Failure to Pay for Work Performed by RKI

RKI asserts that WDF breached the sub-subcontract by failing to tender payment to RKI after WDF received payment from Andron in accordance to the terms of the sub-subcontract. (Pl. Mem. at 27.)  Article 4 of the sub-subcontract provides:

> Within five (5) days after receiving a
> progress payment from Owner and/or GC under
> the Contract Documents, Contractor shall make
> a progress payment to Subcontractor equal to
> a ratable share of the progress payment based
> upon the value of the Completed Work and
> Stored Work as of the corresponding Monthly
> Billing Date, to the extent approved by
> Contractor and allowed and paid by Owner on
> account of the Work . . .

(Joint Ex. 3 at 4.)  Thus, the sub-subcontract required WDF to
pay RKI within five days of WDF's receipt of payment from Andron
on August 27, 2013, which would have required payment to RKI no
later than Tuesday, September 3, 2013.  (Pl. Mem. at 27
(excluding Labor Day and the weekend under N.Y. Gen. Constr. Law
§ 25).)  The following facts are undisputed: WDF received
$464,481.45 from Andron on August 27, 2013 for work performed on
the Project from June 1, 2013 through June 30, 2013 (Joint Stip.
¶¶ 15-16); WDF received $134,274.07 from Andron for work and
material provided by RKI during June 30, 2013 through August 31,
2013 (Joint Stip. ¶ 8; Def. Mem. at 15.); "WDF did not pay to
RKI any monies for work performed in connection with the Sub-
Subcontract during the months of June, July and August 2013."
(Joint Stip. ¶ 36.)  Accordingly, based on the undisputed facts
above, WDF did not remit payments to RKI for work performed at
the Project despite receiving the funds from Andron.

        Turning to the elements of RKI's breach of contract
claim, here, the parties do not dispute that a valid contract
was formed between the parties.  WDF argues that RKI failed to
adequately perform its obligations under the sub-subcontract,
leading to WDF's August 28, 2013 Letter, which purportedly
relieved WDF of its duty to tender payment to RKI for June
through September 2013 work.  (Def. Mem. at 23-24.)  In other
words, WDF argues that RKI was in default due to its delays and

understaffing, thereby relieving WDF of its obligation to tender payment after WDF delivered its purported notice letter to RKI on August 28, 2013.  (*Id.*)  For the reasons stated in the court's findings of fact, however, this court concludes that RKI's performance was timely as shown by the Whiteboard entries and according to the credible testimony, and that RKI either satisfied or was not required under the sub-subcontract to satisfy the seven work items identified in WDF's August 28, 2013 and September 16, 2013 Letters.  Accordingly, because RKI was not in default of the sub-subcontract, the court concludes that WDF was obligated to tender payment to RKI in accordance with Article 4 of the sub-subcontract, but failed to do so.

        In turn, because a "[f]ailure to tender payment is generally deemed a material breach of a contract," *ARP Films, Inc.*, 952 F.2d at 649, the court concludes that WDF's failure to pay RKI for work completed in June through September 2013 constituted a material breach of the sub-subcontract.  WDF's material breach of the sub-subcontract thereby relieved RKI of its obligation to perform and precludes WDF's recovery on its counterclaim for breach of contract as discussed below.  *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) ("Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or,

synonymously, where that party has committed a material breach.") (citing *Hadden v. Consol. Edison Co. of N.Y.*, 312 N.E.2d 445 (N.Y. 1974))).

Moreover, WDF baselessly argues that it was permitted to withhold sums that became due to RKI after it delivered the August 28, 2013 Letter to RKI under Article 26 of the sub-subcontract.  (Def. Mem. at 25-26.)  For reasons explained below, the court first finds that the August 28, 2013 Letter did not constitute a notice of default, and second, also finds that WDF was not entitled to withhold payment to RKI under the sub-subcontract.  Article 26 only permits a termination of the sub-subcontract after two written notices of default and the expiration of two 48-hour periods.  (*See* Joint Ex. 3 at 24 (Article 26).)  Accordingly, contrary to WDF's assertions, WDF was not permitted to withhold sums owed to RKI as of August 28, 2013, because WDF failed to comply with the default procedures under Article 26.  Thus, when WDF received $134,274.07 from Andron on August 27, 2013 for work performed by RKI during June 30, 2013 through August 31, 2013, it was obligated under the sub-subcontract to remit payments to RKI within five days of receipt by WDF, as required under Article 4 of the sub-subcontract.[23]  For these reasons, the court concludes that RKI

---

[23]    As late as September 5, 2013, Mr. Cutrone was still representing to RKI that RKI's June 2013 "check [was] being processed." (Tr. 528:15-530:6; *see* Joint Ex. 95.)  Accordingly, as late as September 2013, after WDF delivered

proved, by a preponderance of the evidence, that WDF failed to comply with its contractual obligation to tender payment to RKI for completed work in June through September 2013.[24]

B. Breach of Contract - WDF's Failure to Comply with the Notice and Cure Provision

In addition, RKI also asserts that WDF breached the sub-subcontract by failing to comply with the Notice and Cure provision in the sub-subcontract under Article 26. (Pl. Mem. at 28-33.) Article 26 specifies events that constitute default by RKI and provides WDF the following remedy in the event of default:

> [In the event of] a default hereunder by Subcontractor [RKI], Contractor [WDF] *shall* . . . after giving Subcontractor [RKI] *written notice of default* and forty-eight (48) hours within which to cure said default, have the right to exercise any one or more of the following remedies: . . .
>
> (iii) after giving Subcontractor an *additional* forty-eight (48) hours *written notice* (at any time following the expiration of an initial forty-eight (48) hours notice and curative period), terminate this Subcontract in whole or part . . . .

---

to RKI its August 28, 2013 Letter, WDF was still representing to RKI that it would comply with its payment obligations under the sub-subcontract. This contemporaneous evidence confirming WDF's understanding of its payment obligations under the sub-subcontract contradicts WDF's argument now that it was entitled to withhold payment due to RKI's alleged default.

[24]     WDF also failed to present evidence that it complied with its obligation under Article 6 of the sub-subcontract to deliver a written notice to RKI when WDF decided to withhold payment for RKI's completed work, and failed to present evidence that RKI accepted it. (*See* Joint Ex. 3 at 5-6 (Article 6, granting WDF "the right to withhold [payment] from time to time, only with prior written notice and acceptance" by RKI); Def. Resp. at 17.)

(Joint Ex. 3 at 24 (emphasis added).)  Thus, under the terms of
the sub-subcontract, WDF was required to provide two written
notices of default to RKI with two sets of 48-hour periods
before it could terminate the sub-subcontract.  (*Id.*)

  "Generally, 'a party asserting nonperformance must
afford a defaulting party any contractually-secured opportunity
to cure prior to terminating a contract.'"  *Point Productions
A.G. v. Sony Music Entertainment, Inc*., No. 93-cv-4001(NRB),
2000 WL 1006236, at *3 (S.D.N.Y. July 20, 2000) (quoting *Karabu
v. Pension Benefit Guaranty Corp*., No. 96-cv-4960(BSJ), 1997 WL
759462, at *8 (S.D.N.Y. Dec. 10, 1997)).  Parties must adhere to
contractually-secured cure provisions regarding contract
termination when the cause for the termination is "the very
situation to which the cure provision was intended to
apply."  *Needham v. Candie's, Inc*., No. 01-cv-7184 (LTS)(FM),
2002 WL 1896892, at *3 (S.D.N.Y. Aug. 16, 2002) (quoting *Rebh v.
Lake George Ventures, Inc*., 233, A.D.2d 986, 987 (3d Dep't
1996)); *see also Bausch & Lomb Inc. v. Bressler,* 977 F.2d 720,
727 (2d Cir. 1992) (terminating party breached contract by
providing two-day written notice of termination instead of
contractually-required thirty day written notice);*Filmline
(Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d
513, 519 (2d Cir. 1989) (recognizing a "clear New York rule
requiring termination of a contract in accordance with its

terms"). "The word 'shall' is 'used to express a command or exhortation,' and is 'used in laws, regulations, or directives to express what is mandatory.'" *See United States v. Maria*, 186 F.3d 65, 70 (2d Cir. 1999) (citing Webster's Third New Int'l Dictionary 2104 (1st ed. 1993) at 2085).

Applying these principles, the court concludes that under the Article 26 notice-and-cure provision, RKI cannot be in breach of the sub-subcontract unless WDF first provided RKI with two written notices of default and two 48-hour periods. Moreover, the use of the term "shall" indicates that WDF was mandated to provide these notices and opportunities to cure before it could terminate the sub-subcontract. (Joint Ex. 3 at 24.)

Here, WDF's August 28, 2013 Letter titled "48-HOUR NOTICE" did not constitute a "written notice of default" under Article 26 of the sub-subcontract. (Pl. Mem. at 33; Joint Ex. 56.) After identifying seven work activities that RKI allegedly failed to perform, the August 28, 2013 Letter stated that "WDF may declare RKI in default," and not that RKI was declared in default, if RKI did not take specific actions in 48 hours. (Joint Ex. 56.) Thus, by its very terms, the August 28, 2013 Letter is not a "written notice of default," as required by Article 26 of the sub-subcontract, but rather an advisory notice of what action WDF may decide to take if RKI did not act as

demanded.  Simply put, the August 28, 2013 Letter is no more than a warning to RKI that WDF is contemplating whether to declare RKI in default.  Because Article 26 requires an actual "written notice of default" and not merely a warning that default "may" be declared, WDF's August 28, 2013 Letter cannot serve as a first notice of default delivered to RKI.[25]

Even assuming the August 28, 2013 Letter served as an adequate first notice of default under Article 26, WDF was still required under the sub-subcontract to deliver to RKI a second notice of default with a second 48-hour period before WDF could terminate the sub-subcontract.  At trial, WDF's general counsel testified that a WDF email sent to RKI on September 13, 2013 at 5:23 pm served as the second notice of default.  (Tr. 511:1-512:9; Joint Ex. 105 (the "September 13 email").)  In its September 13 email, WDF states that it "will default RKI on Monday."  (Joint Ex. 105.)  Thus, the September 13 email is also insufficient to serve as a notice of default under Article 26, because, like the August 28, 2013, it warns of a future default instead of actually declaring RKI in default.

---

[25]    WDF has presented inconsistent statements as to which correspondence served as the first notice of default to RKI.  In its Proposed Findings of Fact and Conclusions of Law, WDF asserts that the August 28, 2013 Letter served as the first notice "to achieve certain levels of completion." (Def. Mem. at 27.)  At trial, however, WDF's general counsel represented that an email sent by Mr. Cutrone to RKI and others on August 22, 2013 served as the first notice to RKI.  (Tr. 499:17-500:4; Joint Ex. 107.)  Like the August 28, 2013 Letter, however, the August 22 email is similarly a deficient notice under Article 26 because it does not notify RKI that RKI is in default.  (*See* Joint Ex. 107.)

Finally, the last correspondence sent by WDF to RKI before terminating the sub-subcontract was WDF's September 16, 2013 Letter. (Joint Ex. 57.) This Letter, titled "NOTICE OF DEFAULT," provides that RKI "is in default of the Subcontract with WDF because RKI has breached one or more material terms of its Subcontract." (Joint Ex. 57.) Specifically, the September 16, 2013 Letter identifies the seven activities with modifications noted in the August 28, 2013 Letter and asserts that RKI failed to satisfy those activities. (Joint Ex. 57.) Unlike the August 28, 2013 Letter and the September 13 email, the September 16, 2013 Letter expressly deemed RKI in default, but still failed to comply with the directive under Article 26 of the sub-subcontract because it automatically terminated the sub-subcontract without providing RKI 48 hours to cure the default. Accordingly, for the reasons stated above, the court concludes that WDF failed to comply with the notice and cure terms prescribed in Article 26 and thus improperly breached the sub-subcontract.

## C. WDF's Counterclaim for Breach of Contract

Furthermore, even if the court had not concluded that WDF breached the sub-subcontract, the court concludes that WDF failed to prove its counterclaim against RKI for breach of contract by a preponderance of the evidence. As discussed above in the findings of fact, WDF's counsel clearly and unequivocally

represented at trial that WDF's termination of the sub-subcontract was solely based on RKI's failure to satisfy the seven work items identified in WDF's August 28 and September 16, 2013 Letters.  RKI proved at trial, by a preponderance of the evidence, that it either satisfied or was not required to perform each of the seven activities identified in the August 28 and September 16 Letters.  Hence, based on WDF's counsel's circumscribed grounds for termination as set forth in WDF's August 28 and September 16, 2013 Letters, WDF's breach of contract counterclaim fails.

Even considering RKI's performance outside of the August 28 and September 16, 2013 Letters, however, the court also concludes that WDF failed to prove that RKI breached the sub-subcontract.  WDF asserts that RKI breached the sub-subcontract by failing to adequately provide manpower and piping material.  (Def. Mem. at 26.)  Based on the findings of fact above, RKI neither failed to supply adequate manpower nor piping material.

WDF further argues that it had the contractual authority to demand accelerated performance from RKI and that RKI failed to comply with its August 15, 2013 "Field Directive" demanding such performance.  (Def. Mem. at 24-25; Joint Ex. 54.) Article 7 of the sub-subcontract provides:

> Contractor [WDF] may direct acceleration of
> the Work in order that it may be performed in
> advance of the schedules, time requirements,
> and Project requirements described in this
> Article 7. If so directed, Subcontractor [RKI]
> shall increase its staff or work overtime, or
> both.

(Joint Ex. 3 at 8.)

"Under New York law, each party to a construction contract impliedly agrees 'not to hinder or obstruct [the other's] performance.'" *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1007 (2d Cir. 1991) (quoting *Quaker-Empire Const. Co. v. D.A. Collins Const. Co., Inc.*, 88 A.D.2d 1043, 1044 (3d Dep't 1982)); *see also Young v. Whitney*, 111 A.D.2d 1013, 1014 (3d Dep't 1985) (citations omitted) ("[T]he law implies in every contract that one party will not prevent the other party's performance."). Indeed, each party has an affirmative obligation to facilitate the other's performance. *See Savin Bros., Inc. v. State*, 62 A.D.2d 511, 516 (4th Dept. 1978), *aff'd*, 393 N.E.2d 1041 (1979).

This implied obligation, commonly referred to as the "covenant of good faith and fair dealing," includes "a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002) (internal quotation marks omitted); *see also Storm v. Aquatic*

*Builders, Ltd.*, No. 02-cv-707(FJS)(DRH), 2007 WL 1395457, at *2
(N.D.N.Y. May 10, 2007) (discussing implied covenant of good
faith and fair dealing in construction context).  "Where the
contract contemplates the exercise of discretion, this pledge
includes a promise not to act arbitrarily or irrationally in
exercising that discretion." *Dalton v. Educ. Testing Serv.,* 663
N.E.2d 289, 291 (N.Y. 1995) (internal citation omitted).[26]

> Under these contract principles, the court finds, as
explained above, that WDF's factual basis for accelerating RKI's
performance pursuant to Article 7 was based on WDF's unsupported
position that RKI was "severely behind" schedule at the P.S. 290
project.  (Joint Ex. 54.)  Article 7 provided WDF the discretion
to accelerate work performed by RKI at the Project.  (*See* Joint
Ex. 3 at 8.)  In exercising this discretion, New York law
requires that WDF not exert its authority in an "arbitrar[y] or
irrational[]" manner.  *Dalton,* 663 N.E.2d at 291.  The August
15, 2013 Field Directive exercising WDF's discretion to

---

[26]  In an analogous context, New York courts recognize various defenses to
enforcement of an acceleration clause in a mortgage agreement.  *See Fed. Home
Loan Mortg. Corp. v. Bronx New Dawn Renaissance VII, L.P.*, No. 93-cv-7970
(CSH), 1995 WL 412399, at *1 (S.D.N.Y. July 11, 1995) (collecting New York
cases where courts decline to enforce acceleration clauses where the
enforcing party commits "unconscionable overreach[]," fails to provide "an
opportunity to cure," retains knowledge that any "default was inadvertent and
inconsequential, or was prompted by [the enforcing party's] own unjustifiable
conduct.").  While factually distinguishable from the context of a
construction sub-subcontract, these cases reinforce the court's conclusion
that WDF's conduct in delaying RKI's requisition payments and WDF's erroneous
determination that RKI was in default were inconsistent bases to justify the
acceleration of RKI's performance at the Project.

accelerate RKI's performance states that "[p]er the contract requirements and attached Andron field schedule, [i]t is determined that RKI Construction is severely behind the schedule and progress of the PS-290 project." (Joint Ex. 54.) Thus, WDF's justification for accelerating RKI's performance was based on the "attached Andron field schedule" and WDF's erroneous belief that RKI was "severely behind" schedule. (Joint Ex. 54.) As discussed above in the court's findings of fact, however, RKI was bound by the Whiteboard schedule and under that revised schedule, RKI was not "severely behind" in its work. Accordingly, consistent with the findings of fact above, the court concludes that WDF's demand for accelerated work by RKI through its exercise of discretion under Article 7 was arbitrary, lacking in a rational factual basis, and unreasonable under the circumstances. *See Toledo Fund, LLC v. HSBC Bank USA, Nat'l Assn.*, No. 11-cv-7686, 2012 WL 2850997, at *6 (S.D.N.Y. July 9, 2012) (quoting *Doe v. Nat'l Bd. Of Podiatric Med. Exam'rs*, No. 03-cv-4034, 2005 WL 352137, at *10 (S.D.N.Y. Feb. 15, 2005) ("For an act to be 'arbitrary' it must be 'without sound basis in reason and generally taken without regard to the facts.'"); *Peacock v. Herald Square Loft Corp.*, 67 A.D.3d 442, 443 (1st Dep't 2009) (the question of "whether defendants acted arbitrarily or unreasonably" in violation of the implied covenant of good faith and faith dealing presents questions of

fact); *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 810 (2d Cir. 2014) (noting that "[a] trier of fact could conclude that the decision was arbitrary" in violation of the implied covenant of good faith and faith dealing).

Moreover, the court finds that a number of factors, including WDF's own conduct, contributed to any purported delay in RKI's performance.  Most importantly, as stated above, the court found by a preponderance of credible evidence that WDF's failure to tender payment to RKI likely "hinder[ed] or obstruct[ed] [RKI's] performance."  *Wolff & Munier, Inc.*, 946 F.2d at 1007.  For these reasons, the court concludes that WDF failed to prove its breach of contract counterclaims and dismisses WDF's counterclaim for breach of contract.

D. WDF's Counterclaims for Fraud

Finally, the court concludes that WDF failed to prove its counterclaim for fraud against Alice and Leroy Kay by clear and convincing evidence.  "Clear and convincing evidence is evidence that makes the fact to be proved 'highly probable.'" *Abernathy-Thomas Eng'g Co. v. Pall Corp.*, 103 F. Supp. 2d 582, 595-96 (E.D.N.Y.2000) (quoting 1A New York Pattern Jury Instructions—Civil § 1:64 (3d ed. 1999)); *see also Currie v. McTague*, 83 A.D.3d 1184, 1185 (3d Dep't 2011) ("The clear and convincing evidence standard requires the party bearing the burden of proof to adduce evidence that makes it highly probable

that what he or she claims is what actually happened." (internal
quotation marks and citations omitted)).

WDF asserts a counterclaim for fraud against Alice and
Leroy Kay, in their personal capacities, for allegedly
committing fraud by signing three releases representing that RKI
had paid all union fringe benefits owed under labor agreements,
despite allegedly knowing that RKI still owed monies under these
agreements.  (Def. Mem. at 30-31.)  RKI argues that WDF's
counterclaims must be dismissed because WDF failed to show,
*inter alia*: (1) reasonable reliance by WDF on any of the three
releases signed and (2) fraud damages that are distinct from its
claim for breach of contract damages.  (Pl. Mem. at 37-40.)

After reviewing the relevant testimony and documents
presented at trial and assessing the credibility and weight of
the evidence, the court concludes that WDF failed to show, by
clear and convincing evidence, that it reasonably relied on the
releases signed by Alice and Leroy Kay.  To the contrary, during
the duration of the P.S. 290 project, WDF knew it had delayed
payment to RKI, and WDF was notified that RKI owned money in
union benefits to Local 638.  (Tr. 528:15-530:6, 566:15-567:14;
*see* Joint Ex. 95.)  Moreover, WDF also represented that it
regularly checked with Local 638's union representative "to
ensure that contractors were up-to-date in their benefit fund
payments."  (ECF No. 164, WDF Mem. of Law in Opposition to RKI's

Mot. in Limine at 15; Tr. 917.)  Because WDF admitted that it
was notified by the union that RKI had purportedly not paid all
benefits, and because WDF had an independent means to verify the
representations made by Alice and Leroy Kay (and indeed asserted
that it regularly checked with the union regarding fund
payments), WDF cannot now argue that it reasonably relied on the
Kays' alleged misstatements.

          Under New York law, although reasonable reliance is
often a "fact-intensive" question, *DDJ Mgmt., LLC v. Rhone Grp.
L.L.C.,* 931 N.E.2d 87, 91–92 (N.Y. 2010), it "is a condition
which cannot be met where . . . a party has the means to
discover the true nature of the transaction by the exercise of
ordinary intelligence, and fails to make use of those
means."  *Arfa v. Zamir,* 76 A.D.3d 56, 59-60 (1st Dep't
2010) (affirming grant of motion to dismiss a fraud claim for
failing to show reasonable reliance), *aff'd,* 952 N.E.2d 1003
(2011); *see also Crigger*, 443 F.3d at 234 (A plaintiff "cannot
demonstrate reasonable reliance without making inquiry and
investigation if he has the ability, through ordinary
intelligence, to ferret out the reliability or truth" of the
statement.").  In light of WDF's admissions and other credible
testimony presented at trial, the court concludes that WDF
failed to satisfy its burden of showing reasonable reliance on
the Kay's statements by clear and convincing evidence because

60

WDF was aware that WDF had not paid RKI, that RKI had
purportedly not paid the union benefits and WDF had an
independent means to verify the representations made by the
Kays. *See MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 157 F.3d
956, 961–62 (2d Cir. 1998) (affirming dismissal of fraud claim
after bench trial where the documentary evidence contradicted
and the defendant denied making an alleged false
representation).[27]   The court concludes that WDF failed to prove
its fraud claims against the Kays by clear and convincing
evidence and, consequently, dismisses the fraud claims.

**IV.   Damages**

Having concluded that RKI proved its breach of
contract claim by a preponderance of the evidence, the court
also finds that RKI is entitled to damages in the sum of
$286,790.84 with interest.

---

[27]      Even assuming WDF showed reasonable reliance on the releases, the court
also finds that WDF failed to show special damages unrecoverable as contract
damages. *See Merrill Lynch & Co. Inc.*, 500 F.3d at 183 ("Under New York law,
parallel fraud and contract claims may be brought if the plaintiff . . .
seeks special damages that are unrecoverable as contract damages."). 
Specifically, WDF failed to show that its requested fraud damages of
$41,136.76 are not already accounted for in its counterclaim for breach of
contract.  In its statement of damages in the Amended Joint Pretrial Order,
WDF represented that its breach of contract damages consisted of several
categories of completion costs, including "Labor wages and burden (i.e.,
union fringe benefits)."  (ECF No. 154, Amended Joint Pretrial Order, at 7.)
Accordingly, because WDF failed to present clear and convincing evidence
showing fraud damages distinct from its breach of contract damages, the
counterclaim damages are duplicative and must be denied.  *See Guilbert v.
Gardner*, 480 F.3d 140, 148 (2d Cir. 2007) (affirming dismissal of fraud claim
New York law as duplicative of plaintiff's breach of contract claim).  In any
event, because WDF failed to prove fraud by clear and convincing evidence, it
may not recover fraud damages.

In construction contract cases where the contract is terminated before completion, damages are calculated by considering the "actual job costs plus an allowance for overhead and profit minus amounts paid." *Najjar Indus., Inc. v. City of New York*, 87 A.D.2d 329, 332 (1st Dep't 1982), *aff'd*, 502 N.E.2d 997 (N.Y. 1986).  RKI's theory of damages generally follows the method above:  RKI states that its final requisition delivered to WDF on September 16, 2013 requested an amount of $299,310.84 for work performed at P.S. 290.  (Joint Ex. 46.)  RKI explained that this amount was then reduced by $12,520, which represented the bond cost that WDF paid to Citizens, the surety.  (Tr. 464-65.)  After subtracting the bond cost from the final requisition amount, both parties stipulated before trial that the damages amount claimed by RKI for its work is $286,790.84 plus interest. The damages amount of $286,790.84 represented "the difference between the amount for work RKI claims to have performed ($371,747.60) and WDF's payments ($85,956.76)."  (ECF No. 190, Supplemental Stipulation of Facts and Law for Amended Joint Pretrial Order, ¶ 1.)

Based on the testimony presented at trial by Mr. Kay and his unopposed analysis comparing the amounts invoiced by RKI for work completed through August 2013, and the amounts invoiced by WDF to Andron for work completed through August 2013, the court credits and awards RKI $286,790.84 plus interest.

62

A. Pre- and Post-Judgment Interest

In a diversity action, state law governs the award of pre-judgment interest. *Schipani v. McLeod*, 541 F.3d 158, 164–65 (2d Cir. 2008). The parties' sub-subcontract agreed to the application of New York law, which provides that a prevailing claimant may recover pre-judgment interest "upon a sum awarded because of breach of performance of a contract." N.Y. C.P.L.R. § 50001(a); *see also HTV Indus., Inc. v. Agarwal*, 317 F. Supp. 3d 707, 717 (S.D.N.Y. 2018), *as amended* (June 18, 2018). If pre-judgment interest is awarded, it must be calculated at the statutory rate of nine percent (9%). *See* N.Y. C.P.L.R. § 5004. Pre-judgment interest is calculated from the "earliest ascertainable date the cause of action existed." N.Y. C.P.L.R. § 5001(b). New York law grants courts "wide discretion in determining a reasonable date from which to award pre[-]judgment interest." *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 512 (2d Cir. 1994).

In its post-trial briefing, RKI asserts that the Court should calculate pre-judgment interest from October 29, 2013, an intermediate date between the two dates between which WDF was required to pay RKI under the sub-subcontract. (Pl Mem. at 36-37.) The court finds that the earliest ascertainable date the cause of action existed occurred five days after WDF received Andron's payment on August 27, 2013 for RKI's June 2013

63

performance.  Accordingly, pre-judgment interest at a rate of 9% shall be calculated from September 3, 2013.  In addition, post-judgment interest is awarded pursuant to 28 U.S.C. § 1967 in the manner prescribed thereunder.

### CONCLUSION

Based upon the foregoing findings of fact and conclusions of law, the court grants judgment in favor of RKI as to its breach of contract claim and awards damages to RKI in the amount of $286,790.84 with pre- and post-judgment interest.  The court dismisses with prejudice WDF's counterclaim for breach of contract against RKI and fraud against Leroy Kay and Alice Kay. The Clerk of the Court is respectfully directed to enter judgment for the plaintiff.  The parties shall advise the court no later than November 20, 2020, how they intend to proceed with regard to the outstanding issues reserved.  Plaintiff shall submit a Bill of Costs pursuant to Fed. R. Civ. P. 54(d).

SO ORDERED.


Dated: November 6, 2020
       Brooklyn, New York


_____
        /s/
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York